Good morning, Your Honors. Anne McFarland Draper, and with me, Eric Farber, for the Appellant and Plaintiff PICTURE IT SOLD, INC. This case presents a cutting-edge issue in trademark laws that applies to the Internet, and that is whether a direct competitor can use another's name or mark in paid search listings to target and attract the mark owner's customers and prospects to the competitor's name and website, and whether that conduct constitutes Lanham Act unfair competition. This is a clean case in which to present that issue because it's direct competitor activity. There are no tangential issues about free speech, no vicarious or contributory liability problems. What happened here is that I sold it, bought paid search advertising on PICTURE IT SOLD. Well, it disputes that fact, I think. It says it bought it sold, or it and sold. Well, it actually doesn't dispute that fact. There's some very clever wording. It what it says is that by the time they signed the declarations, they had stopped the conduct. The declaration of Mr. Wetzel and Mr. Sully are very carefully worded in the present tense. They say they're not doing it now. They never denied that they didn't do it in the past. And by the time we move to the appellee's brief in this case, they're saying that they never did it on the logo as in the design, but you can't put colors in your search advertising. And I think what we know now is that that was actually misleading because they were buying PICTURE IT SOLD as a set of words. Right. As I understand the state of play at the moment, I sold it as purchased a negative, which prevents the combination of words popping up, in other words, diverting your potential customers to their website. Do I have that roughly right? They do. If they kept that negative on there forever, we'd be happy. And at the time of the hearing, they had placed a negative, which means that as long as the word PICTURE is not in the searcher's group of words, their ad wouldn't display. Their ad would display as long as PICTURE was not in it. And it accomplishes our goal, which is when a searcher types in PICTURE IT SOLD, they're looking for the appellant's business. And in those circumstances, they shouldn't get the listing for I sold it. I guess that sort of turns my mind to a couple of questions. I know there was some discussions about potential settlement before litigation was started, but have the parties considered the possibility of mediating this case? I mean, it's before us now in a factual situation where the current behavior, as I understand it, of I sold it, is satisfactory to PICTURE IT SOLD. That the purchase of the negative means that this confusion that you're concerned about when the lawsuit was filed, and we understand why you're bringing it forward because there's no commitment to do that for a long time. And they're still doing it on the other competitors, which is strong evidence that they'll resume. But we just have these two competitors before us now. Exactly. Are you willing to risk the possibility that this panel may say it's perfectly appropriate for them to do it without the negative? We are willing to take that risk because we believe clearly that the conduct is wrong under Brookfield. And we have had settlement discussions, and appellants would be happy to go back. But I think where they left with Judge Seaborg is that maybe some clarity was needed before the parties would move. I'll let you continue with your argument. We have an extraordinarily talented circuit mediation office in this building. They're part of the court. They're not RINA judges. They have no ongoing connections with parties to litigation. They resolve everything from death penalty cases to dog bite cases. They're very good at what they do. And having had a number of these battles, if you will, in cyberspace over advertising and the like, going back to the Yahoo case, sometimes a settlement by mediation is more satisfactory than the result. I've said that. Go ahead with your argument. Your Honor, I myself have had good experiences with the circuit mediation office, so we're receptive to that. But moving back to the issues here, I think the real problem is initial interest confusion and the goodwill analysis in whether the movement of the court in Playboy v. Netscape, which found initial interest confusion but went on and discussed the sleek craft factors to test the theory to be certain, whether that erodes the goodwill analysis. What's important from our standpoint is the goodwill aspect of trademark protection. The function of trademark law is to protect marks as an identifier source, which serves a valuable public purpose. How is this different than you're driving down the freeway on day one and I picture it has a billboard up, and day two you drive down and I sold it, has a billboard right beside it? How is this different? Because in your analogy from the brick-and-mortar world, you're not targeting picture-it-sold customers. And what's different about this is the search engine offers a mechanism, as MetaTags did, for a company to come in and specifically target exactly the customers and prospects of the established business. The only reason somebody would type picture-it-sold into a search window is because they're looking for the business associated with that mark. It's not a generic term like eBay drop-off stores. It's a mark, and it's just different enough that people aren't going to be typing that in unless they're looking for this business. And I sold it specifically and deliberately wanted to capitalize on the goodwill associated with the mark picture-it-sold by going not to everybody who might be interested in selling something on eBay, but going specifically to picture-it-sold customers. And that's the inherent wrong here. It's the diversion of goodwill. This is an equally important reason that we protect trademarks, but it's less talked about than the more classic source confusion issue. And we think the Brookfield Court recognized the importance of protecting a mark owner's goodwill. At the bottom, if you don't – Question. Brookfield was – it was the trademark itself that was being used. Movie buff. Yes, yes, it was. Movie buff. And moviebuff.com. Here it's the words and your trademark, I guess. Well, I think here the dominant element of the trademark is the words, and particularly when you get down to search engine searches. I suppose it's possible that if the Mobile Oil Court were faced with the Pegasus problem in an Internet prospect, if for the same reasons that they found that the flying – was close to the flying horse symbol, that they might find some association here. But here we actually have a word mark, although it's stylized. And the dominant feature, especially in the Internet, are the words, picture-it-sold. And what you have here is I sold it buying keyword advertising on picture-it-sold. A second problem – Is that technically correct, what you just said? It is technically correct. Did they purchase those three words? They purchased those words. We presented evidence of it. Picture-it-and-sold. That's correct. Not picture-it-sold. I'm not understanding the difference. You mean with and without the spaces? The three separate words. I guess this is a little like that bestselling book some time ago, Shoots, Eats, and Leaves. And the question was whether it was the answer to a joke about a panda coming into a bar or a description of the diet of a panda, and it depended on where you put the comma. But they didn't. They did not purchase, quote, picture-it-sold, close quote. Is that correct? My understanding is they did not put quotations around the phrase inside. I'm doing that myself. Okay. I'm doing that myself. Well, that's what they would have to do if they're trying to get the whole phrase. Well, no, they wouldn't. And that actually gets into how the search engines operate. Just so I have this clear, they purchased the word sold, correct? They purchased the three words. Let me finish. They pictured the word sold, right? They pictured the word it, right? And they purchased the word picture, right? At the same time. Yes. In combination together. So that before the negative, if you typed in picture-it-sold, you'd probably go to their website. If you were on the ---- You'd get a list that included their website as the top one. Okay. Okay. Yeah. They also purchased the combination of it and sold, in addition to purchasing the three-word combination, picture-it-sold. And it's our view that the only reason they would do that is to target picture-it-sold's customers. You have an intention to capitalize on the goodwill of another business and its mark. And you have to protect the business owner's investment in its mark, or the whole trademark scheme will fall apart. And we think that Brookfield rightly recognized that other important goal that's less talked about, but which is essential in order to protect trademarks in general. Now, it happens that in our case, we also satisfy the sleek craft factors. And I think one of the problems is that sleek craft isn't necessarily the best analytical framework for looking at keyword advertising because it kind of all collapses down into the intent and the similarity in the marks. We think that the goodwill analysis is a better analytical tool. When a customer goes out and targets, and when a competitor goes out and targets another business's customers, that's wrong. And Brookfield recognized that that's actionable. So did Dr. Seuss, and then some of the later cases recognized that that's an actionable wrong. The district court found that even prior to the negative, that what iSoldit was doing did not create initial interest confusion. Is that correct? The district court didn't see the problem because the district court didn't see the similarity between metatags and keywords. And the similarity is that both of them are used purposely by the market. I understand you disagree with what the district court did. I'm just trying to analytically get on the table. Okay. The district court, even prior to the purchase of the negative by iSoldit, found that what they were doing did not create initial interest confusion. Is that correct? I'm not saying whether the district court was right about doing that. Is that what they did? I think that's not exactly it. I think the district court didn't see the confusion, so it didn't see the initial interest confusion because it couldn't find the confusion. Is it correct that the district court held there was no initial interest confusion? I believe that's correct.  All right. Now, this is a lead-up to this question, which is did it make any findings in connection with before or after the purchase of the negative? My understanding is after iSoldit purchased the negative that you suggested or asked the district court to at least preliminarily enjoin the defendants from doing that. Were there any findings before or after the purchase of the negative? No. The district court didn't make findings one way or the other. Okay. There are a number of things that the district court didn't do. It didn't think that picture-it-sold offered any evidence whatsoever of likelihood of confusion. And that's just not a problem with the weight of the evidence, but that's not seeing the evidence as evidence. And the fundamental problem there is that inferences are evidence, and the judicial comparison of the mark, of course, is the most common kind of the inferences from the judicial comparison are the most common form of evidence that arises in a preliminary injunction setting. And we're not at trial or summary judgment here. We're in the early stage. Do you want to save some time for rebuttal?  Thank you. Thank you for your argument, counsel. We'll hear from Aisolda. Mr. Lillis. Good morning. Damien Lillis for the Defendant and appellee Aisolda. I have some responses to some of the comments made in the opening argument. It's your time. Use it as you wish. But first, I just want to get back on the ground floor about what the record on appeal actually is. There have been a number of statements about what Aisolda did or did not do. There have been statements that Aisolda actually purchased the phrase, picture-it-sold. You can consider that in quotes or the actual phrase, whichever. The record on appeal is devoid of any evidence that Aisolda ever did that. The only evidence offered by picture-it-sold is in the excerpts of records at pages 89 through 94. And that evidence is the three words, individual words, that they put into a search engine, picture-it-sold. There's no quotes around it. There's certainly no exclamation point at the end of sold as reflected in the mark that the plaintiff claims to own. Prior to your client's purchase of the negative, if a web user, an internet user, typed the phrase picture-it-sold into Google or Yahoo search engine, what would happen? Are we talking about this is important? Are we talking about the phrase picture-it-sold entered into a search engine with quotes around it? No quotes. No quotes. Well, I do believe that the exhibits attached to the preliminary injunction motion submitted by picture-it-sold are accurate. I don't doubt their authenticity in the sense that it reflects what happens when you search for the individual words picture-it-sold. And in that situation, in fact, it's abundantly clear. Picture-it-sold is the number one result on the natural search result. It comes up number one as any user would expect. It's clear also that Aisolda does have an ad which is clearly listed as a sponsored link. It's also clear that the Aisolda advertisement clearly designates the source of the advertisement as aisolda.com. Further, the ad describes the business of Aisolda as leading eBay auction drop-off chain with 500 franchises, which clearly distinguishes it as distinct from picture-it-sold, which just has one store in Berkeley. And most importantly, and exhibit or page 90, I think, is the best example of this, there's no mark of the plaintiff anywhere in the ad for Aisolda. So these facts, taken as a whole, show that there would be no basis for any user to initially be confused as to the source of the services being offered by Aisolda. Are you familiar with the GatorCom litigation? The pop-up advertisements? Somewhat, yes. That was also known as the when-you cases? Well, GatorCom came all the way to InBank and then settled basically on the day of InBank argument. But as I understand it, what GatorCom did was pop up on an L.L. Bean website a discount coupon for a competitor. How is this different? To be honest with you, I haven't read the case recently and I'm not comfortable with its particulars. Well, let's just suppose. And it is particulars of what is reflected in the ad, I would imagine that would drive Let's suppose, just hypothetically, that in this case, through the intricacies of the and got a listing of their website and then clicked on that website, and when their website came up, up in the corner popped an ad for Aisolda that said, whatever you can get from Picture It Sold, you can get from us cheaper. Would that be appropriate? I do believe that so long as the advertisement that popped up was a comparison of the products and services, did not contain any misleading information, did not leave any doubt as to the source of the advertisement, as to whether there was any association between the two, and if it was covered in those types of clearly identifiable distinguishing characteristics so that the user had no confusion, it might be appropriate. But again, I would have to, of course, go back to look at the Gator cases to see what was discussed. But backing up, this all puts the cart before the horse. It is always the very first thing that a trademark plaintiff must show, and that is what its mark is and whether the defendant is using something that is confusingly similar. There's no evidence in the record here as to what defendant did use or did not use. It's just what Picture It Sold has put into a search engine and then asked the Court to infer that because Picture It Sold put its name in a search engine, therefore, I sold it must necessarily have purchased the phrase Picture It Sold. There's no evidence from Google or Yahoo explaining that that inference would be correct. There's no evidence from Google or Yahoo explaining that its algorithm works in the way as depicted by Picture It Sold. And nor is there any evidence that I sold it ever used the actual mark here. We're forgetting to – well, the plaintiff has forgotten in some respects to first identify what its mark is. It is a logo. It is a stylized mark where the word Picture It appears in black letters. The word Sold is stamped on top of it with an exclamation point. It is a stylized mark. Naturally, there's no allegation that we have used that stylized mark. In the opening argument, counsel indicated that the dominant feature of the logo are the words within it, but they don't have a trademark on the words within the stylized logo. And just because the Internet doesn't permit one currently to search for a logo doesn't transmute a stylized logo mark into a word mark, which the plaintiff certainly could have applied for, but it did not. So it's seeking to gain protections on a mark that it doesn't own. So the record is what it is in that regard, and it's our position that there's certainly no evidence of use by the defendant in commerce of a mark that is owned by the plaintiff. What's your client's position with respect to continuing the negative? Our position is that we are not required to do so, and I've only done that as a gesture of good faith. Okay. Plaintiff, if you can go ahead. But that means you could stop tomorrow? We are not going to. We're not going to. Does it mean you could stop tomorrow? Certainly, yes. No question about it. And this comes back to what is the law. The law is clear that to establish an infringement of a mark, you use the traditional Sleekcraft factors where appropriate. Pick any of the eight that you feel are appropriate for the circumstance. They tend to jump out at you as to the ones which are appropriate. And then on top of that, you can also apply the initial interest confusion analysis that Brookfield used, which some courts have used as part of one of the multi-factor tests. But the initial interest confusion analysis isn't just an independent analysis that allows the plaintiff to avoid identifying what its mark is. And avoid identifying what the defendant purportedly used or did not use. And any similarity between them. That step has been skipped in this case, to the great surprise of us. But getting back to Brookfield, what is initial interest confusion? You look at all the cases that the Brookfield court cited. And each of them involved a situation where the defendant actually published to the public a confusing use of the plaintiff's mark. That is, there was an actual use that was put forth and put out into the public. And that use, and that actually publication is probably the better word, is what triggers the confusion initially in the mind of the consumer. So in the Steinway case, the defendant used the name Steinweg when pronounced as directed by the defendant's managers. It should be pronounced Steinway. Repeatedly referred to the pianos as German Steinways. And even they put the name on the pianos themselves. So there's a publication of something that is confusing to the public. The same also is true in the Dr. Seuss case, where there was a publication of trademark materials that are very similar to the plaintiff's, such as the stovetop hat, the name Dr. Seuss, which the plaintiff or the defendant called Dr. Juice, and also the name Cat in the Hat, which the defendant tried to transmute into the cat not in the hat. So again, there was an affirmative publication. Sotomayor, it was a whole issue in that case, wasn't it, parity? It was an attempt to, yes, the Court found that it truly wasn't. But parity has nothing to do with this case. Well, there was a trademark component to the Dr. Seuss case. Those three components were indeed similar and, in fact, published to the public. That's the only import of that. The same also is true with the Mobile Pegasus Petroleum case. The defendant used the name Pegasus, which the Court concluded was identical to the flying horse logo of Mobile, given the decades and decades of association with that very strong mark. So in each of these instances, there is an affirmative publication of something that triggers the initial interest confusion. The Brookfield case is a little different because the record didn't appear to be as well-established to show what it was that was triggering the initial confusion on the part of the web user. Now, in the discussion of the meta-tags, the Court was quick to note that there were two different kinds of meta-tags, one that is descriptive and one that is a keyword. And it was also citing cases, including the Niton v. Radiation case, in which that Court found that including trademarks in a meta-tag results in those trademarks appearing in the search results listing for the competing defendant's website. Prior to Judge Thompson's opinion, I think it was in Panavision? Yes. If you typed panavision.com in the URL space, you didn't get to the Hollywood Movie Production Company. You went to some possibly extortionate character in Indiana or something like that. Mr. Toppin, yes. Dennis Toppin or Toppin or whatever his name was. How is this different, this case, from both? Oh, well, there's a very clear and easy-to-catch distinction there. In that situation, the defendant was publishing to whomever was on the web the use of a mark that was confusing as to Panavision. It's the same word, Panavision. And it's out there for the world to see. This case is categorically different. In this case, the web user never sees any mark published by the defendant, assuming there is one in the first place. And therefore, there's? I don't understand the arguments you've just made. If you type in, in small case, panavision.com after the www and all of that in the URL and hit enter, and prior to this litigation, you would have gotten it sent to a website owned by Dennis Toppin, not to the Hollywood movie producer. It has nothing to do with trademark at that point or anything. You've just been misdirected. You think you're, when you push the button, you're going to the movie production company, and instead you're going to a guy who registers these domain names so he can extort money from companies. Well, sure. There's an affirmative conduct on the part of the defendant to use a similar name to actually obtain the result of distracting you from where you want to go. I mean, physically, what your client was doing before the negative is very similar, isn't it? There's no evidence in the record as to what my client was doing before the negative. That's a point that we've made multiple times in the brief, and I don't want to beat that. There's evidence, at least, that it purchased it and sold. That is correct. I don't believe that, picture it sold, the plaintiff has the right to preclude others from using the words it and sold in advertising of any kind. There's no reason that it should have the right in this particular instance to preclude those in the retail industry for eBay consignments where everybody takes goods and they sell it. It's a purely descriptive function, particularly when used independent of any other claim distinctiveness of a mark on the part of the plaintiff, and everybody needs to use the words it and sold in order to advertise as an eBay consignment store. I don't believe that the picture it sold, I don't believe the picture it sold can essentially stop the defendant from using two words that comprise its own federally trademarked business name. I sold it LLC. That's federally registered. We have the rights to it, and it is distinctive, and that's why we use it in AdWord advertising. What was the reason for purchasing the negative? I don't want to misrepresent the record. I don't believe it's in the record. It's my understanding that once a concern was raised on the part of picture it sold, that decision was implemented sometime shortly thereafter or some period thereafter. Is it fair to infer that it was necessary to purchase the negative to prevent confusion? No. Okay.  When somebody searches, let's say you didn't have the negative, will I sold it always come up separately designated as a sponsored link, or does it just come up in a general search? It never comes up in a general search, at least as far as the record on appeal is concerned, and that's one of the most telling issues here, and what distinguishes it from the MetaTag cases. In a MetaTag situation, you have a defendant using a trademark word, and as a result, the defendant and the plaintiff are competing for priority on the natural search results. Also with MetaTags, you have the probability that the trademark word will also appear in a description of the URL on the natural search results page. So you have a situation where you might have the defendant's URL plainly disclosed, but the plaintiff's trademark describing the URL, and that triggers some sense of confusion, and I believe that is what may have underlied the MetaTag decision in the Brookfield case. So in turning to what the evidence actually is, and I always turn to page 90 because it's a pretty good telling example. The natural search results do not reflect I sold it anywhere. The entirety of the search results in no way reflect a mark owned by the plaintiff, used by, I sold it. I sold it clearly identifies itself as a competitor in the sense that it's a leading auction drop-off chain with multiple franchises under a heading of sponsored link, and there's just simply no means by which somebody who views this page can have initial interest confusion as to the source of the goods offered by the defendant. Indeed, they just, they were looking for picture it sold, picture it sold appears number one, and it has a link directly to their site. So this is categorically different from a situation where there may be some doubt as to the association of an advertisement with the plaintiff. So this is very different from the Playboy case, in which case an unlabeled advertisement was triggered by use of the plaintiff's keyword. The advertisement that popped up, or it was a banner ad as it was described, did not identify the source of the goods being offered through the advertisement. The users who clicked on that banner ad had no idea where they were being taken to, but because of that there was no disassociation with the plaintiff's mark. There was some ability to be confused as to the source of the goods being offered by the defendant, and that's why this case is very different. This case presents the concern that Circuit Judge Berzon raised in the concurring opinion in the Playboy Enterprises versus Netscape case, where the current opinion gives a number of terrific examples in the regular world where if a consumer interested in a trademark good of the plaintiff goes and seeks information about, and then goes to the clothing store and says, show me the Calvin Klein clothes, they're directed to the second floor, and lo and behold, they get to the second floor, and right next to the Calvin Klein clothes are the store brand clothing, which is marketed to the same person, designed for the same market, maybe even cheaper, and a better deal. And in that situation, it happens every day in the retail world. There can be no initial interest confusion because it's evident who's offering the store brand goods and evident who is offering the Calvin Klein brands. And the concurring opinion has far better analogies than I could muster on my own, but a classic example that everybody sees in the daily world is go into a pharmacy looking for Tylenol, and directly next to Tylenol, and to make it even more apt, you go into the pharmacy and ask somebody for Tylenol. They direct you to the Tylenol, and right next to the Tylenol is generic acetaminophen. There's no doubt as to who is the source of each of those goods, and the customer simply is presented with an opportunity to choose, and there's no confusion there. And that's what makes this case very different from the initial interest confusion cases, the meta tag cases, and the playboy case. And I'm running out of time. I'd be happy to respond to any further questions. I don't see any. Thank you, counsel, for your argument. Rebuttal? How's this different from the Calvin Klein example he gave? It's completely different. Nobody's targeting Calvin Klein's customers. When you go into Macy's, you expect to see lots of different brands in clothing, and you look for the section, the designer clothes section, and you find Calvin Klein in... Walk into the building, and the little guard's there, and I say, where can I find Calvin Klein product for men? And the guard says, second floor, and I come up on the escalator, and there's Calvin Klein, and Kenneth Cole, and 19 other labels. How have I been confused? I mean, I'm looking for Calvin Klein. It's right there, but if I want to look at IZOD or some other product, Tommy Hilfiger, I can't. It's right there, and nobody's confused me. It's not confusing. I'm in a department store that sells lots of brands. I'm in a different venue. It's like being on Amazon and looking for a particular book, and somewhere it says, if you enjoy reading this author, you might enjoy these, too. I'm in a venue that sells lots of different products, but the problem we have here is we're not in that venue, and importantly, we're getting source confusion and the goodwill analysis mixed up. I think what's important to go back to is the definition of initial interest confusion, which is the use of another's trademark to capture initial customer attention, even though no actual sale is finally completed as a result. That's from the Dr. Seuss case, and importantly, what Brookfield said at 1063 is, although there is no source confusion in the sense that consumers know who they're patronizing, there is nevertheless initial interest confusion in the sense that by using the metatags to divert people looking for movie buff to its website, West Coast improperly benefits from the goodwill that Brookfield developed in its mark. And that's really the key analytical difference here is whether you're looking at the goodwill, the diversion of goodwill, and the intentional diversion of goodwill, or whether you're looking at source confusion. As I mentioned, if you make a sleek craft analysis, you have source confusion in this case. But the real injury here is that search engine, paid search advertising, offer the ability to deliberately target a particular business's customers and prospects. It would be as if I had some clever electronic device so that when someone phoned directory assistant asking for North Beach Pizza, I could stuff in my response, which says press such and such number sequence for New York Pizza and press, or one of these, you know, other new pizza places. And then after that, I could give them the number for North Beach Pizza. You know, some people don't care. They want a pizza close by, and they're going to dial the number, particularly if it says press 8 or pound to dial the number now. Technology just offers all these new, great, clever ways for businesses to get their name out and to develop custom. But with that, technology delivers systems for targeting by going into somebody's computer and getting their customer list. This is more in that vein than it is looking for a gray Poupon, the mustard aisle, let's say. Just targeting somebody else's customer. I mean, I suppose a General Motors dealer can stand right outside the Ford agency and hand out leaflets advertising General Motors cars, even though the only people picking them up are there to look at Fords. I've thought about that, and that's a tough analogy, but that is actually not what we're doing here. The facts, the facts are a little different. And I suppose the Ford dealer could come out and and shoo them off the street, too. I mean, it has some ability. Not if they're on the public sidewalk or street. I don't think they could. Well, I'm trying to get a good, strong mental impression, and I'm not a tech buff, so help me. My understanding in Brookfield was that if you inserted movie buff, you went directly to West Coast video and nothing else. Am I right? No, what happened in the Brookfield case was when you typed movie buff into a search engine window, you got a page of listings, just like the kind of search results pages we have here. And there was a link that said West Coast video. And if you clicked on that link, you went to West Coast video's website. And there was another link for Brookfield that went to its movie buff product. And those listings are just as labeled as the listings we have here. The whole labeling discussion is another issue that wasn't addressed by the district court. But when you target somebody's goodwill for the purpose of diverting it, you have to ask how much of a label it takes to undo or dispel that initial interest attention that happens. And it might be a little different than passing out flyers in front of the Ford dealer. It might be that when you target it, you have to do something extra, like they have in newspapers and magazines where it has right across the top, advertising session. And that little pale gray mention of sponsored link isn't the same as saying advertising session. Not everybody understands that it's a paid advertising, and it's not clear which ones are and aren't. What you have on the search result page is a list. And it's a list of listings. And you can click at the one at the top or the second or third or fourth one. But I sold it comes up at the top every time. There's no clear break that says above this are paid advertising and below this are your search results. Oh, it says sponsored links, doesn't it? Well, that's pale and over the gray, but it doesn't tell you where the sponsored links end. There's no bar of separation. Where in the record is it shown that I sold it, bought, picture? I sold it, bought, the phrase, picture it sold. It shows in the record two ways. One is by the declaration testimony of Kevin McGinnis, which includes Rick Wetzel's statements to him that it's not illegal and everybody does it. The second is the given --- Well, everybody does it. What the -- Well, I'll read the declaration again. Kevin McGinnis said, please stop buying search engine advertising on picture it sold. Or Wetzel said, what do you want? And he said, I want you to stop buying search engine advertising on picture it sold. And Wetzel said, well, we're not doing it, but actually everybody does it and it's not illegal. So he -- That's the evidence that they did it. We're not doing it. And his testimony that they're doing it. Then you have the search engine reports and the inferences to be drawn from the search engine reports. Not only the search engine reports that show that I sold it was buying, not only the search engine reports, but I sold its ad displays for all the competitors. Auction Drop, Snappy Auctions, Quick Drop, New Market. And there's nothing similar enough between I sold it and those other competitors that it could happen by some search engine accident. The reality is that they were buying on all the competitors of which picture it sold is only one. We don't represent the other competitors. They're not at issue here today, but those search engine reports are probative in giving rise to an inference that that's what they're doing. The third thing is they can go over your argument well over your time. Thank you for your argument. The case just argued will be submitted for decision, and the Court will stand in recess for the day.
judges: Canby, Thompson, Hawkins